## JOHN E. SCHWARZ, CATHARINE SCHWARZ, AND EUROTAS P. HASTINGS *v.* TUNIS S. WENDELL.

The general rule is, that whatever is responsive to the bill is evidence for, as well as against the defendant.

If a fact stated in the bill, and answered by defendant, is material to complainant's case, or is a circumstance from which a material fact may be inferred, the answer, in such case, is responsive to the bill, and is evidence in the cause.

An answer may sometimes be evidence of a fact not stated in the bill, as when the bill sets forth part of complainant's case only, instead of the whole, and the part omitted, and stated in the answer, shows a different case from that made by the bill, and is not in avoidance merely.

Where an answer does not show a different case from that set up in the bill, but sets up new matter in avoidance, it is not evidence of such new matter.

A trustee is not allowed to deal with his *cestui que trust* as with a third person, and purchases of trust property made by him, will not be sustained, unless the Court is satisfied that he has acted throughout with the most perfect fairness, and taken no advantage of his peculiar relation.

The defendant W., a trustee, having an opportunity to make what it was supposed would be an advantageous purchase for his *cestui que trust*, a married woman, of the remaining two-thirds of land of which she owned an undivided third, refused to make it without an equal share of the profits, and, by his advice, and that of her husband, the *cestui que trust* was induced to make a note for $4,000, to raise money for the purchase, which was endorsed by W. and finally paid out of the trust funds; and the husband, March 7th, 1836, without consulting the *cestui que trust*, agreed with W. on her behalf, that he should have half of the profits of the property to be purchased, deducting travelling expenses, &c. attending the same, and if he should not succeed in purchasing, that his expenses should be paid; and W. purchased one of the two-thirds and took a conveyance of it to himself, as trustee. An offer being made for the purchase of one third, W. advised the *cestui que trust* and her husband to accept it, but they declined; and W. insisting on selling his share, they agreed to purchase from him, and pay him what would be his share of the profits, by assigning a certain bond and mortgage, and giving a note for the balance. When the assignment was drawn up, the *cestui que trust* declined executing it, alleging that she wanted the property for other purposes, and also that an account presented by W. was too high. W. then requested her to set off his share of the land, and appoint another trustee. She then agreed to purchase his share

on the conditions previously agreed to, and a new trustee was appointed. In this settlement a note was given by the *cestui que trust* and her new trustee, for $3,-980.24, to pay the account which W. had presented for his services. The Court set aside the agreement of March 7, 1836, and the sale by W. to the *cestui que trust*, and decreed that W. should procure the note for $3,980.24, (which he had transferred,) to be cancelled, or else that the amount of it, with interest from the day it fell due, should be charged against him in the account to be taken of his trust, and that he should be allowed a reasonable compensation for his services as trustee.

A defendant cannot, by his answer, vary the terms of a written contract.

The agreements of the husband of a *cestui que trust*, in relation to the trust, are not binding upon her.

Where a bill, asking, among other things, relief against a note, was filed within three years and a half from the time it was given, and within six months after it became due, *it was held*, that the delay was not unreasonable, and was no ground for refusing relief.

A trustee is entitled to a reasonable compensation for his time and services.

THE bill states that Catharine Schwarz, wife of John E. Schwarz, on the eleventh day of February, 1823, was entitled to one undivided third part of all the real and personal estate of her late father, Abraham Sheridan, deceased ; and that she and her husband, the said John E., on that day, by an indenture of two parts, conveyed to Isaac Wampole all her interest in the real estate aforesaid, for her sole use and benefit, and subject to her appointment; and that, on the 14th day of October, 1828, they assigned to him, in trust as aforesaid, a bond and mortgage for $10,000. That, on the 27th day of April, 1829, the defendant, Wendell, was appointed trustee, in the place of Wampole, and continued such until the 28th day of January, 1837, when the complainant, Hastings, was appointed.

That, on the 6th day of March, 1836, Wendell, who was then acting as trustee, inquired of John E., whether it was probable that the two-third parts of seventeen

in-lots and four out-lots in Erie, Pennsylvania, held in common by Catharine, and two other heirs of Abraham Sheridan, deceased, residing in Philadelphia, could be bought; adding, that he had received an offer from Captain John F. Wight, for the whole of said property, and that, perhaps, twenty-five or thirty thousand dollars could be obtained for it, but that no person would purchase the undivided third part belonging to Catharine alone. John E. replied it was probable they might be purchased, if the owners had not heard of the sudden rise of property in the western country, and they should be offered money. Wendell then asked him what share he, John E., would allow him, if he would raise the money, and go to Philadelphia, and purchase one or both of said shares. John E. replied, he would allow him a liberal compensation for his time and trouble, and would pay all his expenses. This, and several other offers, Wendell declined, proposing, at the same time, to raise the money, and make the purchase, if John E. would allow him one half of the profits; to which John E., without consulting with Catharine, finally assented. On the next day, at the request of Wendell, John E. and Catharine came from Springwells, where they reside, to Detroit, when, for the first time, Wendell required Catharine to execute a note for $4,000, payable to him or his order, at the Bank of Michigan, in ninety days, on which to obtain the money. John E., having understood Wendell's proposition on the previous day as an offer to furnish the money, at first protested against it. But Catharine, acting on the advice of John E. and Wendell, was finally persuaded to execute it. Wendell then drew up the following agreement, which was signed by him and John E., but without the knowledge, direction or consent of Catharine, viz:

" Memorandum of an agreement made this 7th day of

March, 1836, between Tunis S. Wendell and John E. Schwarz, for himself, and on behalf of his wife, Catharine Schwarz, viz : It is understood between the parties that the said T. S. Wendell has this day obtained a loan from the Bank of Michigan, on a note of Catharine Schwarz, endorsed by said Wendell, for $4,000, for the purpose of going to Philadelphia, to purchase the interest which Richard J. Harding and John G. Thomas have in 17 in-lots and 4 out-lots in the village of Erie, Penn'a., on the best terms he can ; and, if he succeeds, then the profits arising on said purchase are to be equally divided between the said Wendell and Catharine Schwarz, and in the same way if he only succeeds in getting one share, after deducting travelling expenses, &c., attending the same ; but, if said Wendell does not succeed in making the purchase, then the said Catharine is to pay the travelling expenses of said Wendell, and he to charge nothing for his services in attending to the business ; all the interest which said Harding and Thomas have to other lands and lots, if said Wendell can succeed in purchasing them, they are to be expressly for the benefit of said Catharine, and said Wendell is to have no interest in them whatever. In witness whereof," &c.

Wendell got the note discounted, went to Philadelphia, and, on the nineteenth day of the same month, purchased of John G. Thomas, and Anna E. his wife, (the said Anna E. being one of the daughters and co-heirs of Abraham Sheridan, deceased,) all their interest in and to the seventeen in-lots and four out-lots, it being one undivided third part, for $1,200, and received a conveyance thereof, reciting that, in consideration of the sum of $1,200, to them, the said John G. Thomas and Anna E. his wife, paid by Tunis S. Wendell, trustee of Catharine Schwarz, out of the proper trust money of the said Catharine, they, the

said John G. Thomas and Anna E. did grant, bargain and sell unto the said Tunis S., trustee of the said Catharine, for her use, and for her heirs and assigns, all their interest in the said seventeen in-lots and four out-lots. That he made other purchases of real estate for the said Catharine, and paid therefor with the money obtained on the $4,000 note; that he has never rendered an account of the money so received by him, and that no part of it has ever been repaid to complainants, and they believe a large balance still remains in his hands.

The bill further states that, on the 10th day of June, 1836, the note at the bank became due; that it was taken up by a new note given by Catharine, and endorsed jointly by Hastings and Wendell, Catharine having procured Hastings to endorse it with Wendell, at Wendell's request; and that this last note was paid by Wendell, on the thirty-first day of August of the same year, out of the trust moneys.

That, on the third day of September, 1836, Wendell stated to John E. that he had an opportunity of selling his share in the Erie property, to one Abijah Fross, for $5,000, but, if Catharine wished to have it, he would take a bond and mortgage she held against Joshua Boyer, in part payment, and her note for the balance. John E. replied, if she was willing, he had no objection, and that he would prefer having her purchase it, to a stranger. A few days after, Charles H. Stewart called on Catharine with an assignment of the bond and mortgage, and a note for the balance of the $5,000, to obtain her signature and acknowledgment; but she refused to execute them, stating to Mr. Stewart that Wendell must wait until the Erie property was sold for his share, which she thought he could well afford to do, as he would receive a large amount for a journey to Philadelphia.

The parties afterwards becoming dissatisfied with each other, Hastings was appointed trustee in the place of Wendell, on the 28th day of January, 1837. After the deeds of conveyance for transferring the trust were executed, but before they were delivered, Wendell required Catharine, as a condition of his transferring the trust, to sign the following note, viz:

"$3,980.24. Three years from date I promise to pay T. S. Wendell or bearer, three thousand nine hundred and eighty dollars $\frac{24}{100}$ for value received, with interest at the rate of six per cent.

"Detroit, Jan'y 28, 1837."

The demand was a surprise on complainants; and, thereupon, Wendell presented a memorandum or statement, on a scrap of paper, in which he charged Catharine for his half of the Erie purchase, the sum of $5,000, and then deducted certain items not intelligible to complainants, leaving a balance in his favor amounting to the sum stated in the note, and insisted she should purchase his interest in the property at the price, and on the terms proposed. She insisted it was not just to require her to account for such profits until a sale was made of the property, and offered to pledge her word that, when a sale was made, he should receive his just proportion; but, he insisting on its being then arranged, she signed the note, to avoid further difficulty. He then required that Hastings should also sign it in his capacity of trustee, which he did, at the request of Catharine.

To show that the $4,000 note in the bank was paid with trust moneys, the bill further stated that John E., at the time Wendell became trustee, was in embarrassed circumstances, and that the trust moneys, to a large amount, with the assent of Catharine, were applied in payment of

his debts; and that, for the purpose of refunding the moneys so paid, John E., on the 10th day of March, 1836, conveyed to Wendell, as trustee of Catharine, a piece of land deeded to him by John B. Godfroy, situate in the county of Monroe. That, on the first day of August, 1836, John E. made a contract for the sale of an undivided half of the land to Lewis Godard, for $7,500, of which the sum of $3,841.29 was paid in cash, and the balance secured by a mortgage; that Wendell deeded the premises to Godard, and received the money, and took a mortgage from Godard, as trustee, for the balance; and that, on the 31st day of August, 1836, he gave Catharine credit for the $3,841.29, in the account he kept of the trust funds, and at the same time charged her with the payment of the $4,000.

The bill further states that Wendell, much of the time, had large amounts of trust moneys on hand, and derived great advantage from their use ; that the management of the trust property occasioned but little trouble ; and that by the terms of the trust, expressed in the deed creating it, Wampole, and Wendell, his assignee, were to retain, and reimburse themselves, out of the rents, issues, and profits, of the trust property, all such charges and expenses as they were put to in the execution of the trust ; but no provision was made for paying the trustee for his services. That there were many incidental advantages attending the trust ; that it was understood, when the trust was transferred to Wendell, these incidental advantages should compensate him for his services. That Wendell had sold the note ; that it belonged to John L. Schoolcraft, who had placed it in the hands of an attorney for collection, and that Catharine and Hastings had been called on to pay it. That the Erie property purchased of Thomas

and his wife was not worth over $2,000, and had not been sold.

The defendant put in a plea of an account stated, and agreed upon, at the time the trust was assigned to Hastings, and of a covenant from Hastings and John E., in the deed of assignment, to indemnify him against all acts done by him as trustee, &c. The plea after argument was ordered to stand for an answer, with leave to complainants to except.*

Defendant afterwards put in his answer, admitting the trust as stated in the bill, the assignment of it to him, and that he acted as trustee until Hastings was appointed. That, early in March, 1836, John F. Wight applied to him to purchase Catharine's share in the Erie property, provided the other two shares could be had; but he was unwilling to purchase one share only, and proposed, in case one or both of the other shares could be procured, to give for the whole $30,000, or for two of the shares $10,-000 each. A day or two after, John E. called on defendant, and said he had received a proposition from Wight for the Erie property, provided the two shares, or one of them, held by the co-heirs, could be had; and defendant replied Wight had made the like proposition to him. John E. said the shares could be bought low for money, if the owners had not heard of the rise of property at Erie,— probably for $2,000,—and proposed defendant should raise the money and go to Philadelphia and purchase the interest of the co-heirs, in all the real estate held by them and Catharine as heirs of Abraham Sheridan, deceased, as well the Erie property, as other real estate; saying, if defendant would do so, he would pay him well for it. Defendant refused to accept the proposition, but stated he

---

* See a former report of this case, in *Harr. Ch. R.* 395.

would raise the money from the Bank of Michigan, and make the purchase, for one half of the profits; that he would procure the money for ninety days, and, as Mr. Wight would pay down one-third of the purchase money, he could pay the money borrowed, out of it; and that he should want to take with him $4,000, instead of $2,000, to ensure the object, and suggested to John E. to converse with Catharine on the subject. A day or two after this conversation occurred, John E. called again, and proposed to defendant to raise the money, and purchase one or both of the shares, and he should have one half of the purchase, and receive one half of the profits, and, if he failed in making the purchase, he should receive nothing for his time and services, but should be paid his expenses. Defendant accepted the proposition, and, to save the necessity of defendant's procuring an endorser, to comply with the bank regulations, it was agreed the note on which the money was to be raised should be signed by Catharine, and endorsed by defendant; and, to save a multiplicity of conveyances, that the property should be conveyed to him as trustee,—as well his own share, as that purchased for Catharine. Soon after this agreement was made, on John E.'s making some remark in regard to the profits defendant would receive on the whole purchase, defendant said he would exclude from his share in the purchase all lands other than the Erie property; and, with this variation, the agreement was finally concluded. A day or two after this, Catharine and John E. called on defendant, when he presented the note to Catharine for her signature, remarking it was to raise money to make the purchase, and she signed it, saying she hoped he would succeed. On this note, defendant obtained the money of the Bank of Michigan, on his own account and responsibility, and, to avoid all misapprehension, he drew up the

agreement in writing mentioned and set forth in the bill, dated March 7th, 1836, which was signed by himself and John E. He believed Catharine had a full understanding of the matter, when she signed the note. She was particularly interested in having the purchase made, to effect an advantageous sale of her interest, and John E. was accustomed to attend to her business, in matters relating to the trust. Defendant was in the habit of communicating with him, and through him with Catharine. Denies John E. protested against Catharine's signing the note, or that it was not understood by John E. that the money was to be raised on a note signed by her. Does not know whether Catharine saw the written agreement, or not. The note was discounted by the bank, and defendant received on it $3,938. On the 19th day of March, he purchased of John G. Thomas and Anna E. his wife, the said Anna being one of the co-heirs, her undivided third of the real estate held by her and the other co-heirs of Sheridan, for $3,000, the said estate embracing the Erie property, and other property in Pennsylvania. Her interest in the Erie property was estimated at $1,200. He received a conveyance to himself, as trustee of Catharine, and, on his return to Detroit, gave full information to John E. and Catharine, of what he had done. The balance of the money, amounting to about $778, he was about to repay to the bank, on the note, when John E. stated that Catharine and himself wished to use it, and requested defendant to pay it to them, assuring defendant that other means should be provided for paying the note. He said it should be paid out of the proceeds of a tract of land belonging to him; and defendant let them have the money. Wight did not call and make the proposed purchase. In June, a short time before the note at the bank became due, one Abijah Fross offered to purchase of defendant one-third

of the Erie property, for $10,000;—one-third to be paid down, and the residue to be secured on the property;— stating at the same time that he would purchase the other third on like terms, if he could raise the money. Defendant communicated Fross's offer to John E. and Catharine, and advised them to accede to it, as the note was approaching maturity, and he wished to take it up. They objected, and said they would make other provision for the payment of the note. John E. said he would pay it out of the proceeds of real estate he had in the county of Monroe, and which he expected to sell to one Lewis Godard. Defendant expressed his wish, at any rate, to sell his share to Fross, to which John E. and Catharine replied by offering to purchase it, and pay him what would be his share of the profits, if sold. They offered to give him a bond and mortgage they held against one Joshua Boyer, for near the amount, and their note for the balance, which defendant agreed to accept; and, in making up the amount to be paid, defendant put the consideration paid for the property at $2,000, instead of $1,200, and they were to pay the $4,000 note at the bank. Defendant requested Charles H. Stewart to prepare an assignment of the mortgage, and the other papers, which, as defendant was afterwards informed by Stewart, were prepared and presented by him to Catharine to be executed, but that she refused to execute them. John E. afterwards called on defendant, and stated they had concluded not to part with the mortgage. Thereupon, defendant proposed to relinquish his trust, and requested Catharine to appoint another trustee, and set off to him his share of the property. They acceded to the appointment of a new trustee, and again offered to purchase his interest on the terms above stated, but by a different mode of payment, viz: their note at three years, with interest at six per cent, to be also sign-

ed by the new trustee, which defendant agreed to. When the $4,000 note became due, June 10th, 1836, John E. and Catharine sought a renewal of it, and a new note was given, endorsed by defendant and Hastings. Denies the endorsement of Hastings was procured at his request, or that the renewal was on his account. Upon the agreement for the relinquishment of the trust, John E. informed defendant that Catharine had appointed Hastings her trustee. Charles H. Stewart was employed to prepare the necessary deeds and papers, but, before they were prepared, defendant exhibited to John E. a statement of the amount due him for his interest in the Erie property, similar to the one made and exhibited to him and Catharine on the agreement for a sale to them for the Boyer mortgage. This statement was made by charging $5,000 as the value of defendant's interest,—that being half the amount offered by Fross for one third,—and deducting therefrom half the agreed consideration of the purchase, being $1,-000, and the interest thereon, and half the expenses incident to the purchase, adding interest from the time John E. and Catharine finally agreed to purchase, being about the latter part of August, making a balance due defendant of $3,980.24. He also exhibited to John E. an account of all other matters between him and John E. and Catharine, including the balance of the $4,000 paid to John E. and Catharine at their request, upon which there was a balance due him of $180.59, making, in all, the sum of $4,160.83, the sum mentioned in defendant's plea; and John E. was fully satisfied and concurred therein.

After the papers for conveying the trust were prepared, January 28th, 1837, defendant and complainants met for the execution of them, when defendant again exhibited his statements and accounts, and all matters growing out of the trust and purchase were then fully adjusted and set-

tled, and Catharine and Hastings signed the note to defendant for $3,980.24. Catharine made no objection to signing the note. John E. also executed a note to defendant for the $180.59, to be paid out of moneys which defendant expected to receive for him. Defendant denies he required Catharine to sign the note, as a condition of transferring the trust; or, that she was taken by surprise; or, that she did not act voluntarily in signing it; or, that any part of the statement or account exhibited by him, was unintelligible; or, that she stated it was not just or right to require her to account for such profits until a sale, &c. After the papers had been executed, but not before, Catharine remarked she thought Mr. Wendell might have waited for his share until the property had been sold; which was the only remark made by her during the whole interview, or at any other time, to the knowledge of defendant, indicating any other than full and entire satisfaction. Neither Catharine nor John E. ever expressed any dissatisfaction with the settlement, to defendant, before filing the bill. Defendant had been trustee for nearly eight years. He had not charged or received any compensation, and, on surrendering the trust, was induced not to make any, in consequence of the profits on his interest in the purchase.

The note at the bank was not paid with money held in trust for Catharine. A part of it, $3,841.29, was paid with money received of Godard for the Monroe land, and the balance, $158.71, was furnished by John E. out of his own funds. Defendant had sold the $3,980.24 note to Schoolcraft. Does not know the present value of the Erie property; it would probably be valued at much less than when he sold it.

John E. was much embarrassed in his circumstances when defendant was appointed trustee, but the trust mo-

ney was not used to pay his debts, with an understanding it would be replaced by him. He was under the necessity of selling some real estate to pay his debts, which was purchased by defendant, and paid for out of the trust money, and a deed was taken by defendant, as trustee. Denies the land in Monroe, sold to Godard, was conveyed to him on the 10th day of March, 1836, as trustee for Catharine, with a view of replacing trust moneys that had been used to pay John E.'s debts. Defendant was absent from Detroit when the deed was made to him by John E., and did not know of the existence of such conveyance until his return, in April, from Philadelphia, when John E. and Catharine applied to him for the balance of the money left after the purchase of the Erie property; and John E. assured him he would provide the means for paying the note at the bank out of the avails of the Monroe property, which he expected to sell to Godard, when defendant received the deed from him, and held the land as a fund for the payment of the note. Defendant conveyed the land to Godard, but knows nothing as to the form of the mortgage taken from Godard by John E. He does not recollect having ever seen it. With the $3,841.29 received of Godard, and $158.71 advanced by John E. out of his own private funds, the $4,000 note was paid; and entries were made of these transactions in the trust books, that there might be some record of them. The payment of the note, and the receipt of the moneys with which it was paid, were placed opposite each other, and were never regarded as the moneys of Catharine.

Charles H. Stewart, the only witness in the case, proved the execution of the deed transferring the trust from defendant to Hastings. Two or three weeks previous to that time, there was a settlement between John E., Catharine, and defendant, which was admitted by the parties

to be a full and final adjustment of all matters growing out of the trust, and witness was directed to prepare an assignment of a mortgage on certain property in the city of Detroit, to secure to defendant the balance so admitted to be due.    Witness did so, and it was either executed, or agreed to be executed by John E., and, by his desire, was presented to Catharine for execution, in the presence of John E., but she declined executing it, saying they wanted that particular property for other purposes.    The means witness had of knowing that the settlement was a full and final settlement, were the statements and admissions to that effect, by the parties.    The particulars of the settlement did not transpire in the presence of witness. No change of the trust was then contemplated, but a mere security, by defendant, of an admitted balance.    On the refusal of Catharine to execute the assignment, the defendant required to be relieved from his trust, and then it was that Hastings was selected.    Before the transfer of the trust, or at that time, a note was executed by Hastings, as trustee, to defendant, for the balance admitted to be his due, according to the previous arrangement. Defendant wished to be relieved from his trust, and to get security against his responsibility as trustee, and evidence of the balance due him, at one and the same time.    Witness recollects that John E., and, he believes, Catharine, at the time of the proposed assignment of the mortgage, said the defendant's account was too high.    They did not say this as protesting against it, or as refusing to pay it. Wendell required to be secured in the amount due to him, and also to be released from his trust.    Both requisitions were acceded to, and no objection was made, at any time, to secure the balance.    When the papers were prepared, they were executed without question.

*Joy & Porter*, for complainants.

I. It is clear, from the whole case, that Wendell, in his journey to Philadelphia, and the purchase of the Erie property, was acting in the capacity of agent and trustee of· Mrs. Schwarz, and not on his own behalf. The money was all furnished by her, and he was acting throughout for a compensation, which he was to realise out of the expected profits. The colorings and allegations set up in the answer, to prove it to have been a joint speculation, (such as the statement that he obtained the money on his own credit and responsibility, the offer by Mrs. Schwarz to buy his share, &c.) and the various matters by which he seeks to divest himself of the character and responsibility of an agent, are not responsive to the bill, and not proved, and therefore must be taken to be, as they really are, false. 2 *J. C. R.* 88; 13 *Ves. R.* 47; 7 *Ves. R.* 587; 2 *Ball & Beat. R.* 382; 1 *Wash. C. C. R.* 224; 1 *Mumf. R.* 373; 2 *Caines Ca.* 66; 1 *J. R.* 580.

He had no right to take a deed, except as trustee for her; and, had he done otherwise, or taken a deed to himself, individually, of any part of the property, it would have been a fraud, and this Court would have compelled him to transfer it to Mrs. Schwarz. His statement about the agreement to take a deed thus, *to save a multiplicity of conveyances*, is responsive to nothing in the bill, and is also inconsistent with the tenor of the executed agreement, which was that he should be compensated, by receiving *half the profits of the Erie property*, when sold, and *not half the title*. He could not take title to himself personally. 10 *Ves. R.* 394; *Story on Agency*, 194.

Even if Wendell had furnished the money himself, as he agreed to do, he could have had no right to purchase the property for any one except Mrs. Schwarz. Had his

conduct been fair, he could have enforced his agreement, in equity, by a bill to obtain a sale of the property, and a division of the profits.    But he did not furnish the money, or any part of it.    The note was finally paid, not by him, but by Mrs. Schwarz.    In contemplation of law, the money obtained from the bank was hers throughout.    It was obtained for her, expended for her, and finally repaid by her.

II. The sale by Wendell can only be viewed as a speculation by a trustee out of a *cestui que trust*, by a sale of an anticipated interest in the profits of a purchase made by him, on joint account, even upon his own allegation, but in reality with her money.

The allegations in the answer, tending to show that the agreement and sale, after the offer made by Fross, were with and to Mrs. Schwarz and her husband, jointly, are not responsive to the bill.    They are, moreover, inconsistent with the facts appearing.    The note executed for the alleged purchase, was signed by no one but Mrs. Schwarz, and her trustee, Mr. Hastings.    The Boyer mortgage, which was to have formed a part of the consideration, was her property alone.    The plea alleges that the note was for the amount found due from Mrs. Schwarz to Wendell, and the answer admits that the balance was made up of the Erie purchase profits, which were conveyed to her by Wendell.

The trustee says he bought for the joint benefit of his *cestui que trust*, and himself, but without advancing any money.    Upon the best state of the case which can be made out for the defendant, it appears that he managed to procure his *cestui que trust* to assume the whole responsibility, repay the money borrowed, assume all the risk of any possible loss in the speculation, and then pay him

$4,000 for his chances for profits. This is truly a handsome operation to be made out of a *cestui que trust*.

Upon this state of facts, will not this Court, upon the prayer of the injured *cestui que trust*, lay its hands upon this transaction, and compel the trustee to refund the money which he has wrongfully obtained, and pay, or take up, and indemnify his *cestui que trust* against the note thus wrongfully obtained, and for which he has received value ?

We take the law to be perfectly clear that no transaction of this kind,—no trade,—no business transaction of this nature,—between a trustee and *cestui que trust*, can stand, if the *cestui que trust* chooses to set it aside. The principle, as we understand it, is one of universal application, founded on policy, and has *no regard to the fairness of the transaction, character of the parties, or any thing of that nature*. It is based upon this, that, where parties are so situated with regard to each other, one being a trustee holding the property of the other, and the other being a *cestui que trust, the trustee may, from his position, acquire an influence over his cestui que trust, which gives him an advantage in all matters of business, and places the other comparatively in his power*. That, from the difficulty of examining cases of this nature, from the infirmity of human testimony,—the difficulty of sifting the motives of parties,—courts of equity have established a general rule, that *no transaction* between parties so situated shall stand, if the *cestui que trust* wishes to set it aside. Courts say that this is the only principle which will save the weaker party from becoming the victim of overreaching, or artful, or designing men. It is a principle founded on reason, and sound sense, and good policy. 1 *Story Com. on Eq.* 307, 310, 316, *et seq.;* 10 *Ves. R.* 394; 6 *Ves. R.* 268; 9 *Ves. R.* 244, 295; 2 *Sch. & Lefr.* 500, 665; 1 *Cox Ca.* 119; *Talb. Ca.*

111; 2 *Bro. R.* 427; 10 *Eng. Cond. Ch. R.* 190; 8 *Eng. Cond. Ch. R.* 312.

A variety of cases have been decided, and relief afforded in equity, where, from the nature of the transaction, and the situation of the parties, fraud or imposition might be presumed.   See, for instance, 8 *Cow. R.* 370 ; 3 *P. Wms. R.* 139.

The above cases, with many others, establish the doctrine beyond a question, that, in cases where the parties stand in the confidential relations of attorney and client, guardian and ward, trustee and *cestui que trust*, they shall not bargain with each other, and, if they do, the *cestui que trust*, the ward, or the client, shall, if they please, set aside the sale, and be restored to the rights which they formerly possessed.

Courts of equity adopt the broad and sound principle, that, where these relations exist between the parties, they cannot deal with each other on equal terms.   The confidence which is reposed, the means of influence which one party holds, give him so much the advantage, that it is dangerous, and may be ruinous to the other, to suffer them to contract.   And it is so difficult to weigh this influence, to investigate these cases, and ascertain whether any advantage has been taken, that courts have adopted a rule, which puts the sting of disability into the contract. The parties should not deal with each other.   It matters not how fair the transaction, it cannot stand.   The Court will not inquire into this point.   This is fully established by the above cases.   Although in the various cases, various reasons are assigned for the principle, yet, in all the principle is established.   And, in several, it is broadly laid down that, where these confidential relations exist, the parties cannot deal on equal terms, and therefore they shall not deal at all.

III. But in this case, were there no such relations exist-ing, the transaction is such that this Court ought not to per-mit it to stand. It is such an one as shocks the conscience. The advantage taken is so great, that it is, upon its face, an outrage upon *honor and common honesty.* To procure money upon my note to buy land for me, and to receive as a compensation half the profits when sold, and then pay the note out of my money, and compel me to pay $4,000 for 'half the profits, in advance, is upon the face of it, an outrageous transaction ; and we are fully persuaded that, if there were no other feature in it, this Court would say that the advantage taken, is so monstrous, that it cannot be sustained. It falls directly within the class of cases where the Court will set aside the trade for inadequacy of consideration. 2 *Bro. R.* 179 ; 7 *Ves. R.* 30 ; 8 *Ves. R.* 133 ; 9 *Ves. R.* 234 ; 10 *Ves. R.* 470, 292, 209 ; 14 *Ves. R.* 28 ; 13 *Ves. R.* 95 ; 3 *Ves. & B.* 187 ; 2 *Sch. & Lefr.* 395 ; *Sugd. on Vend.* 226.

IV. It may be argued that here too much time has been permitted to elapse, and that we come in too late. But this is not so. We have, in a case of this nature, the right to file our bill at any time when the note is sought to be enforced against us.

How could we know that Wendell had sold it ? And if he had not sold it, could he enforce it against us ; and might we not file our bill whenever he should seek to en-force it ? Besides, he has got a security from us, which it is unconscientious that he should retain.

Mrs. Schwarz was not, until recently, before filing her bill, acquainted with her legal rights. It is sufficient that, whenever she does become acquainted with her rights, she seeks to redress them. Simple lapse of time will not bar her rights in a case of this nature, unless with a full knowledge of her rights, she confirms the trade. 12 *Ves.*

*R.* 374 ; 5 *Pet. Cond. R.* 150; *Cooper Eq.* 146; 5 *Ves. R.* 678; 11 *Ves R.* 226; 9 *Ves. R.* 292 ; 2 *Ves. R.* 272, *& note;* 14 *Ves. R.* 91 ; 2 *Atk. R.* 119.

V. The only question, then, is, whether the plea and answer contain a bar to this inquiry, or whether this transaction may not yet, notwithstanding the matters in the plea and answer alleged, be made right in this Court.

The plea is not sufficient, and, if sufficient, constitutes no defence to this suit.

It is not sufficient, because it does not aver that the account, which was stated, is a true and just account. This is necessary, though the bill do not impeach the account for fraud or error.   3 *J. C. R.* 388 ; 1 *Beames Pl.* 230 ; 3 *Atk. R.* 70 ; *Cooper Pl.* 279 ; *Mitford Pl.* 260; 4 *Paige R.* 195.

Another reason is, that the plea does not put in issue the matter charged in the bill, nor deny the constructive fraud alleged, nor the imposition.   The plea should deny *the facts* which constitute our ground for redress and relief. 4 *Paige R.* 196 ; 3 *Paige R.* 277; 2 *Atk. R.* 119.

As to the covenant of indemnity, we say, first, that it has no application at all to this case, from its very terms, and if it can only operate as a release, and is subject to the same objections on the account stated, or the note,— that it was unfairly obtained,—it would be pleading one part of an unjust settlement to cover up and prevent the investigation of all the antecedent frauds.   *Story Eq. Pl.* 613, *&c.; Mitf. Pl.* 261; 2 *Sch. & Lefr.* 721; 6 *Madd. R.* 62; 2 *Sim. & Stu.* 279; 3 *Paige R.* 277.

Neither the plea nor the answer denies what we set up as an equitable ground of relief.   They simply assert that the account which was rendered was just and true, and was acquiesced in, &c.   Now, as we have shown, this is not enough, unless he denies the circumstance which we

allege, to wit, the transaction relative to the Erie property, by which Wendell makes at least $4,000 out of his *cestui que trust*, which was allowed in the settlement, and makes the settlement unjust. And we may read the answer, admitting this fact, to show that the account rendered, which included this charge of $4,000 for profits in that transaction, was not a just account, notwithstanding Wendell's assertion that it was just and true. This Court is to say whether it was just, upon the facts before it. *Mitf. Pl.* 299; 4 *Paige R.* 178; 2 *Paige R.* 574.

*Goodwin & Collins,* for defendant.

I. The answer, (except as to the covenant set forth in the plea, which is proved by the testimony of Stewart,) is responsive to the bill, and is evidence. It is evidence as to all contained in it responsive to the bill, whether it be the stating, charging, or interrogating part of it. All the allegations so responsive are to be taken as true, unless contradicted by two witnesses, or one witness and pregnant circumstances. 3 *Barb. & Harr. Eq. Dig.* 383; 2 *Pet. Cond. R.* 285; 3 *Id.* 417, 424; 1 *Wend. R.* 583; 3 *Paige R.* 557; 1 *Cow. R.* 711; 4 *Paige R.* 368.

This rule has been established in practice as long as there has been a Court of Chancery in Michigan, and is not now an open question. The rule contended for by the complainants, as laid down in the cases cited by Counsel, does not exclude the answer, or any part of it. It is that where "*new and distinct* matters are set up in *avoidance*," and there is a replication, those matters must be proved. None of the matters set forth in the answer are *new and distinct* matters. They are part and parcel of the transactions upon which the complainants seek relief, and of which they have called for a discovery. The case in 3 *Mass. R.* 278, is to this effect, and no more. See also

2 *McCord Ch. R.* 90, 101, 102, 344, 350; *Recks* v. *Postle-thwaite, Coop. Ch. Ca.* 161; 14 *J. R.* 63, 73; 8 *Cow. R.* 394; *Green* v. *Vandman,* 2 *Blackf. R.* 324.

Even the strict rule of the Southern cases cited, does not support the complainants' case.   The rule, in these, as stated, is " that the answer is not evidence when it asserts a right affirmatively, in opposition to the plaintiff's demand."   But they agree that *every thing stated in the answer, responsive as to the creation of the original liability charged, must be taken together.*   But where the original liability is once admitted by the answer, there is no escape from it but by proof."   2 *Cow. & H. notes to Phil. Ev.* 268.

Upon this rule, all of the answer is evidence in the case. The bill seeks relief from a note, upon a variety of facts alleged to show a want of consideration, imposition and fraud.   The answer denies that any such grounds of relief do, or *ever did exist,* and gives a full history of the transactions referred to, showing there were none.   The "liability charged," is repelled from beginning to end.

II. This is not a case of a purchase of trust property by a trustee, nor do the cases on this subject apply to it.

It is contended that the trustee, while the relation exists, cannot buy of the *cestui que trust* the trust property.   This is not such a case, and if it were, the position is not true. The *cestui que trust* is, in equity, the owner of the trust property, and may alien, demise, and dispose of it, and, even when a *feme covert,* encumber it for her husband's debts, and may sell and dispose of it to the trustee, by a fair bargain, clear of fraud and imposition.   1 *Madd. Ch.* 113, 453, 456; 2 *Kent Com.* 162; 7 *J. R.* 548; 6 *Ves. R.* 625; 9 *Ves. R.* 246; 12 *Ves. R.* 373; 3 *Meriv. R.* 208; *Newl. on Cont.* 453; 1 *Cruise Dig.* 500.

III. It is insisted, on the part of the complainants, that the purchase made by defendant, of the Erie property,

was with trust funds of Mrs. Schwarz; and that the trustee cannot use the trust funds to make profit for himself. If the facts were so, yet, if it were done with the agreement of the *cestui que trust*, and a consideration is rendered for it, labor and service being performed therefor, it is not perceived why such an agreement, fairly made, cannot be sustained; and, more especially, why a subsequent settlement of such an agreement performed, should not be sustained.

But it is not true that trust funds of Mrs. S. were used for the purchase of the Erie property; it was not understood or agreed that they should be so used, nor were they so used. The agreement between Schwarz and Wendell was, that the purchase of the Erie property should be made by Wendell, with funds to be raised by him at the Bank of Michigan, upon a note, to which Mrs. S. was to be a party, to save the procuring another endorser; that Wendell should own one half the property, and have half the profits; that, on Wendell's return, the sale to Wight should be made, and, out of the proceeds, the money was to be repaid. Wendell so raised the money, and made the purchase; and let Mr. and Mrs. Schwarz have the balance of the money on hand, (Wight not having purchased,) on Schwarz's assurance that, if necessary, he would pay the note out of a sale of land to Godard. A deed of this land was made to defendant during his absence, and, on this agreement, *it was tendered to him by Mrs. S. and received under that agreement.* Wight not appearing, and the note approaching maturity, Fross proposes to purchase, and Wendell urges a sale, and payment of the note. On Mr. and Mrs. S.'s objecting, Wendell proposed to sell his share to Fross, and Mr. and Mrs. S. then propose to buy it, and pay him by the Boyer mortgage, &c., Mr. S. proposing as before, to pay the note out of the proceeds of

his sale to Godard.    Mrs. S. then concluded to retain the Boyer mortgage, and other security was proposed and finally given.    Schwarz obtained a renewal of the bank note, and it was subsequently paid out of the proceeds of the land, as agreed.    The purchase money of the Erie property, then, was raised on a note which was finally paid out of property and funds of *John E. Schwarz*, and not trust funds of Mrs. S., and had no connection with them.

The deed of the Monroe land to Wendell took effect only on its delivery.    9 *Cow. R.* 255.    On its face, its legal operation was to convey the property absolutely to W. Under the agreement under which it was delivered and received, it was held for the purposes provided for thereby. If, in the absence of the agreement, any trust arose, other than that on the face of the deed, it was a resulting trust for John E.    And a resulting trust arising by parol, is destroyed by parol; as in this case, by the agreement between Wendell and J. E. Schwarz.    Besides, the agreement has been fully executed, and there is nothing left unexecuted to be settled in regard to it.    1 *Cruise Dig.* 403, 422; 4 *Kent Com.* 300; 2 *J. C. R.* 405.

IV.    There was a full settlement between the complainants and the defendant, of all matters and transactions between J. E. and Catharine Schwarz, and the defendant, and particularly growing out of, or connected with the trust, at the time of its surrender; and at the same time the covenant was executed set forth in the plea.    By the plea and answer, it will be seen, that there was then a full, fair and final account, preceding said settlement, and consummated therein, as to all said matters.    These constitute a full bar; and the covenant has, it is contended, the full force of a *release.*    1 *Madd. Ch.* 100; *Mitf. Eq. Pl.* 259; 2 *Cond. Ch. R.* 116, 449; 1 *Swift Dig.* 302.

1 *T. R.* 446 ; 8 *T. R.* 483 ; 4 *Paige R.* 368, 481 ; 3 *J. C. R.* 569 ; 1 *Young R.* 306 ; 1 *Hopk. R.* 239 ; 1 *Barb. & Harr. Eq. Dig.* 55.

It is shown clearly by the facts in the case, that the balance claimed at the time of the settlement, was fully understood and acknowledged. Not only therefore is all imputation of fraud removed, but it would be difficult to present a case of a more full, fair and complete adjustment, and final settlement, of any matter whatever.

Besides, the settlement and bond of indemnity, were executed and accomplished with the concurrence of Mr. Hastings, the new trustee, as well as Schwarz, the husband.

V. Not only was there this settlement, but the complainants lay by several years thereafter, before bringing their bill, or making any complaint. Upon the grounds upon which they complain, this is an important fact, and should itself be a ground for refusing any relief. The times have changed. The property has, it appears, depreciated, when it might have been sold at the time, for the proposed price; and the note has been transferred, and the avails of it most likely exhausted. Such is the doctrine recognised by this Court, in *Jones* v. *Disbrow, Harr. Ch. R.* 102. See also, 1 *Madd. Ch.* 99, 417; 2 *Cow. & H. notes to Ph. Ev.* 339 ; 3 *Har. & J.* 43; 1 *Edw. R.* 417 ; 2 *Paige R.* 556; *Newl. on Cont.* 466; 10 *Ves. R.* 423 ; 2 *Cond. R.* 449.

Wendell was by agreement to be paid for his services. In his answer, he states them to be worth $500 a year, for the eight years, and, in consequence of his interest in the Erie purchase, he charged nothing therefor in the settlement. A trustee is entitled to compensation where there is an agreement to that effect, though not in the trust deed. And here the agreement is sworn to in the answer, in response to the bill. *Atk. R.* 59 ; 1 *J. C.* 27.

VI. It was understood when the Erie property was purchased, that it should be directly sold, and the consideration repaid, and the profits realised. This contract, which was perfectly fair, the parties were bound to fulfil, and a court of equity would compel the refusing party to do so, and that without injurious delay. 1 *Madd. Ch.* 418; 2 *Sch. & Lefr. R.* 604. The parties here, instead of carrying it into effect as originally agreed, do so in another manner;—that is, S. and his wife refuse to do so as originally proposed, but themselves become purchasers of Wendell's interest. This is just and equitable, according to the established principles of this Court.

VII. This is not a case in which the Court will or can furnish any relief. The note has been sold, the holder of the note is not a party to this suit, and not only so, but, when Wendell purchased the Erie property, he paid the consideration, to wit, the funds raised at bank. Schwarz repaid this, by payment of the note at bank under the agreement for the sale by Wendell to him and Mrs. S. of his interest. Will the Court now annul the sale, and compel Wendell to take back his half of the Erie purchase, and repay the consideration and interest, and pay and take up this note, and besides, (if the Court adopt the equitable rule they must,) put the parties in *statu quo?* To do all this, in this case, at this time, under the circumstances, would be iniquitous and tyrannical in the extreme.

The bargain with Mr. and Mrs. S. prevented Wendell from selling to Fross. The Court *cannot, now, put the parties back where they were*, but to cancel the agreement would make Wendell pay all the money above mentioned, and leave him, with his former share of the Erie property on his hands, with the price depressed, and the sale prevented by the acts of the complainants, which they seek to avoid;

and, moreover, for eight years' services, worth $500 per year, deprive him of all remuneration or indemnity. Further, Hastings and Mr. S. were parties to the agreement, and Hastings is to the note, and the legal effect of the note is that Hastings is personally liable. Will the Court relieve him under these circumstances, and especially when Mrs. S., being a *feme covert*, is not liable at law on the note ? And Schwarz himself, who is a party and prime mover in all the transactions, should (if any other than the parties to the note) be compelled to pay. Let the Godard mortgage, and the other portion of the Stony Creek property, be applied by complainants to its payment ; and these now are, it would seem, in the hands of Mrs. S. and Mr. Hastings, her trustee.

The bill should be dismissed, and the parties left where they have placed themselves.

THE CHANCELLOR. The question has been discussed at some length, how far the defendant's answer is evidence. The general rule is, that whatever is responsive to the bill is evidence for, as well as against, the defendant. But there is frequently much difficulty in applying the rule, and regard must always be had to the case made by the bill, in determining what is, and what is not responsive. Is the fact stated in the bill, and answered by defendant, material to complainant's case, that is, must it be proved to entitle him to relief; or is it a circumstance from which such material fact may be inferred?—for the complainant may prove his case, by either positive or presumptive evidence. If it is, the answer, as it regards such fact, is responsive to the bill, and is evidence in the cause. It may also, sometimes, be evidence of a fact not stated in the bill; as where the bill sets forth part of complainant's case, only, instead of the whole, and the part admitted

and stated in the answer shows a different case from that made by the bill, and is not matter in avoidance merely. As where a bill, filed to redeem stock, alleged it had been pledged for five hundred dollars, and the answer stated it was pledged for eight hundred dollars, in addition to the five hundred dollars stated in the bill, the answer was held to be responsive.    *Dunham* v. *Jackson*, 6 *Wend. R.* 22. Here the answer, instead of being responsive to a particular fact stated in the bill, was responsive to complainant's case, which the answer denied, by showing a different case.    But where the answer does not show a different case, but, admitting the case made by the bill, sets up new matter in avoidance of it, the answer is not evidence of such new matter.    As where the defendant sets up usury, in his answer to a bill filed to foreclose a mortgage.    *Green* v. *Hart*, 1 *J. R.* 850.    Such are the general principles, to be deduced from the cases, for our guide in determining what parts of an answer are responsive to the bill.    *Hart* v. *Ten Eyck*, 3 *J. C. R.* 62, *and note at p.* 92; *Beckwith* v. *Butler*, 1 *Wash. C. C. R.* 224; *Ringgold* v. *Ringgold*, 1 *Harr. & Gill*, 11, 81; *Hagthorp* v. *Hook*, 1 *Gill & Johns. R.* 270; 13 *Ves. R.* 47; 7 *Ves. R.* 404, 588; 2 *Ball & Beat. R.* 382; 3 *Russ. R.* 149; 19 *Ves. R.* 182; *Attorney General* v. *Oakland County Bank*, *ante*, 90.

A different exposition of the rule was given in *Woodcock* v. *Bennet*, 1 *Cow. R.* 711, and also, as it would seem, in *Green* v. *Vandman*, 2 *Blackf. R.* 324.    In the first of these cases, it was held that an answer to statements, or facts, contained in a bill, whether such statements or facts were necessary to make out complainant's case, or related to matter in avoidance of it, merely, was nevertheless responsive, and evidence in the cause.    This exposition of the rule is liable to several objections.    It makes defendant a witness for himself, to prove his defence, as well

as a witness against himself to prove complainant's case, and, if it be right that the matter in controversy between the parties should be settled by the defendant's oath alone, unless disproved by two witnesses, or one witness and corroborating circumstances, then his answer, in all cases, should be evidence, whether responsive in either of the senses above stated, or not. To make the rights of parties in this respect depend upon the drawing of a bill, looks too much like sacrificing right to professional skill. Defendant is not bound, nor can he be required, to answer any statement or fact in the bill not necessary to make out the complainant's case; and, when he does, it is voluntary on his part, and his answer, for that reason, should not be binding on complainant, as he would, in no case, be likely to disclose what would make against himself. Defendant cannot be a witness for himself. Nor is there any hardship in the rule; for he may, by a bill of discovery, make complainant a witness for him on the same terms that he is a witness for complainant. *Clason* v. *Morris*, 10 *J. R.* 542, and *Field* v. *Holland*, 6 *Cranch R.* 24, are cited by the Court in *Woodcock* v. *Bennet*, but neither of them support that case. In each of these cases, the part of the answer in question was responsive to a fact stated in the bill, which it was necessary for complainant to prove, to make out his case.

Wendell's answer in all its material statements, is responsive to the bill; and the case must be decided upon the answer, and the testimony of Stewart. So far as the case charges defendant with fraud, it is clearly disproved; and I should not hesitate for a moment to dismiss the bill, if the relation of trustee and *cestui que trust* had not existed between the parties, when the several transactions stated in the bill took place. There are certain relations existing in society, necessary for its prosperity and well

being, and which it is the policy of the law to foster and
protect.  With that view, and to keep individuals from
availing themselves of these relations for selfish purposes,
the law has, in some cases, imposed a disability, on per-
sons so situated, to deal with each other on the same
terms, as those on which they are allowed to deal with
third persons.  The relation of trustee and *cestui que trust*
is one of this description.  A trustee to sell cannot pur-
chase the trust property.  So fully satisfied are courts of
equity of the necessity, in order to secure the faithful
execution of the trust, of removing from the trustee all
*hopes of personal gain, or advantage to himself, that he*
is not allowed to purchase the trust property for himself
or another, at public or private sale; and, if he does, the
sale will be set aside, or a re-sale of the property will be
ordered, for the benefit of the *cestui que trust*, if he ask it
in a reasonable time, however fair and honest the transac-
tion may appear, on the part of the trustee.  " If," says
Lord Eldon, in *Ex parte Bennett*, 10 *Ves. R.* 385, " a trus-
tee can buy in an honest case, he may in a case having
that appearance, but which, from the infirmity of human
testimony, may be grossly otherwise."  The law on this
point is too well settled by adjudged cases, and the policy
and reasonableness of the rule too obvious, to be departed
from.  *Campbell* v. *Walker*, 5 *Ves. R.* 678; *Ex parte Ben-
nett*, 10 *Ves. R.* 381; *Davoue* v. *Fanning*, 2 *J. C. R.* 252.

A trustee may, however, purchase trust property of his
*cestui que trust.*  But courts of equity look upon such trans-
actions with so much jealousy, and there is so much diffi-
culty in sustaining them, that Lord Erskine, in *Morse* v.
*Royall*, 12 *Ves. R.* 372, said he should not have regretted
to have found that the rule above stated, extended to the
case of a trustee purchasing of the *cestui que trust*.  And
Lord Eldon, in *Coles* v. *Trecothick*, 9 *Ves. R.* 244, says, " it

is a transaction of great delicacy, and which the court will watch with the utmost diligence; so much so, that it is very hazardous for a trustee to engage in such a transaction." In this case, the sale was sustained; but it was a very strong case in favor of the trustee, or, rather, for his father, for whom he made the purchase as agent, and fully justified the remark of Lord Eldon, that if any case could exist for releasing the rule, by consent of parties, that was one. In *Morse* v. *Royall*, the sale was also sustained. In that case the *cestui que trust* was determined to sell, and frequently teased the trustee to buy, who was reluctant, but finally consented. Some years after the sale, the *cestui que trust* becoming dissatisfied, it was referred to a third person to say what further consideration the trustee should pay, who awarded that he should pay as much more as he had paid in the first instance. On these and other strong circumstances, favorable to the trustee, the sale was sustained. To set aside such sale, it is not necessary to show fraud. *Fox* v. *Mackreth*, 2 *Bro. R.* 400. That would be placing the parties on the ground of strangers, dealing with each other at arm's length. The Court should be satisfied, not only that there was no fraud, but, that no use had been made by the trustee of the relation existing between him and the *cestui que trust*, to bring it about; that it was fair in all its parts, and such a transaction throughout as the trustee himself would have approved of, had it been with a third person instead of himself. When the Court is fully satisfied on all these points, the sale, or contract,—for it is not necessary that it should be a sale of trust property,—should be sustained; when not, it should be set aside.

I cannot look upon the agreement for the purchase of the two-thirds of the Erie property in any other light, than as a joint speculation between Wendell and Mrs. Schwarz.

Mrs. Schwarz had inherited one-third of the Erie property from her father, Abraham Sheridan, deceased, and Wendell held this, and other property, amounting to $10,000, or more, in trust for her.  A few days before the agreement, Wight applied to Wendell, to purchase Mrs. Schwarz's share, if the other two-thirds, or one of them, could be procured, and to give $30,000 for the whole, or $20,000 for two-thirds.    Wight, about the same time, made application to Mrs. Schwarz, or to her husband, John E., who called on Wendell, and stated the shares could be bought low for money, if the heirs residing in Philadelphia, to whom they belonged, had not heard of the rise of property at Erie; and proposed to him to raise the money, and purchase them, offering to reward him well for his services.  This Wendell refused, unless he could have half of the profits.   Nothing further was done at this time; but, a day or two after, John E. called again, and agreed to Wendell's proposition.    A day or two more elapsed, when the written agreement of March 7th was drawn up by Wendell, and signed by him and John E. At the same time, a note for $4,000 was signed by Mrs. Schwarz, and endorsed by Wendell, on which the money was obtained at the bank to make the purchase.    This part of the case comes within the rule laid down by Lord Ch. King, *Keech* v. *Sanford*, 3 *Eq. Ca. Abr.* 741, where a trustee applied to a lessor for a renewal of a lease, for the benefit of his *cestui que trust*, an infant, which the lessor refused to give.   The trustee then took a lease to himself, and it was decreed that the lease should be assigned by him to the infant.   The Chancellor said he must consider it a trust for the infant, " for, if the trustee, on refusal to renew, might have a lease to himself, few trust estates would be renewed to *cestuis que trust;* and, though it might seem hard that the trustee was the only person of all man-

kind who might not have the lease, yet it was very proper that the rule should be strictly pursued, and not in the least relaxed; for it was very obvious what would be the consequence of letting trustees have the lease, on refusal to renew to *cestuis que trust.*

When John E. applied to Wendell to raise the money, and purchase the shares of the coheirs, he refused, although promised a liberal compensation for his services, until he had secured to himself, by the agreement, an equal interest in the purchase. I will not say he was wrong in refusing, or that his duties as trustee required a compliance with the request, although, judging of things as they then appeared, it would be the means of making an advantageous sale of the trust property at Erie, and of adding something to the trust estate, by way of profits on the shares to be purchased. If the proposition, instead of coming from himself, had been made to him by the *cestui que trust,* he should have declined it. What he had refused to do as trustee, in a matter so closely connected with the trust, he should not have done for his own benefit. It may, as observed by Lord Ch. King, seem hard that he should be the only person of all mankind who should be excluded from making such an agreement with the *cestui que trust,* but public policy requires it. The object of the rule is to secure fidelity on the part of the trustee, by taking from him every possible motive to act otherwise than for the interest of his *cestui que trust.* He had it in his power to defeat the speculation; and, as things have turned out, it would have been well had it never taken place. The money to make the purchase could not be raised by the *cestui que trust,* without his consent; and to permit a trustee, under such circumstances, to impose his own terms, would be placing the *cestui que trust* entirely at his mercy. It is impossible to say what influence such con-

siderations may have had, in producing the agreement of March seventh.

He succeeded in purchasing the interest of one of the heirs, and took a deed to himself, as trustee. Wight did not come to make the purchase, but, a short time before the note at the bank was due, a Mr. Fross offered to purchase a third of the property, at $10,000. He informed Mrs. Schwarz and her husband of the offer, and advised them to accept it, and that the note at the bank was approaching maturity, and he wished to take it up. They objected, and said they would provide for the payment of the note. He then wished to sell his share, at any rate; and Mrs. Schwarz and her husband offer to purchase and pay him what would be his part of the profits, if it were sold. They propose to turn out a bond and mortgage against Joshua Boyer, in part payment, and to give their note for the balance; and Stewart was employed to draw an assignment of the bond and mortgage. He did so, and called on Mrs. Schwarz to execute it. She refused, saying they wanted the property for other purposes. She also said, defendant's account was too high. Defendant then requested Mrs. Schwarz to appoint another trustee, and to set off to him his share of the property. Mrs. Schwarz and her husband again offered to purchase his interest, on the terms they had before proposed, except as to the mode of payment. Mr. Hastings was appointed to succeed the defendant in the trust. The papers, including the note for $3,980.24, were made out and executed by the respective parties. After they were executed, Mrs. Schwarz said she thought Mr. Wendell might have waited for his share until the property was sold. This is a brief outline of the case.

Defendant was the first to propose that he should share in the profits of the purchase; and this after he had refused

to raise the money and make the purchase as trustee. When Fross offered to purchase a third of the property, he proposed to sell him a third that had been purchased, in which he had an interest, and not the third belonging to the *cestui que trust*, although it was with a view of selling this last, that the purchase had been made. When he gave as a reason for selling it separately, the payment of the note at the bank, they offered to provide for its payment from other sources; and it was not until he insisted on selling his share, that they proposed to purchase it. And after Mrs. Schwarz had refused to execute the assignment of the mortgage, and not before, he asked to be discharged from the trust, and to have his share set off to him. We do not see the *cestui que trust* volunteering, and urging on the trustee, in one important step taken by the parties; on the contrary, they appear, for the most part, to have originated with the trustee, and to have been taken by the *cestui que trust* with more or less reluctance. In *Morse* v. *Royall*, Lord Erskine noticed particularly that the trustee was not the first to propose a sale, but that the *cestui que trust* was determined to sell, and urged the trustee to purchase.

The money was obtained on Mrs. Schwarz's note, endorsed by Wendell. It should, I think, be considered a part of the trust fund, because it was obtained on the note of the *cestui que trust*, which the trust fund might have been called on to pay. Had it afterwards been paid by Wendell, out of his own funds, it would have been a good charge against the trust estate. Defendant says in his answer, Mrs. Schwarz signed it to save him the necessity of procuring an endorser. She should, then, have endorsed it, and not signed it as drawer. The contract states it to have been the note of Catharine Schwarz, endorsed by Wendell, and speaks of Wendell's interest in the pro-

fits of the purchase to be made. Defendant cannot be allowed, by his answer, to explain away the terms of the written contract, and to say it is different from what it purports on its face to be. No money was advanced by him, and none was intended to be. He expected to pay the note, at maturity, with the money to be received from Wight, on the sale to him. The land was conveyed to him as trustee, and, by the written contract, he stipulated for a share in the profits of that part of it, only, which there was, at the time, a prospect of selling to great advantage.

The contract of March 7th, for these reasons, was not binding in equity on Mrs. Schwarz, the *cestui que trust;* and I cannot consider any thing done by her subsequently as a free and voluntary confirmation of it, with a knowledge of her rights. She appears to have been under the impression that she was bound by it, and to have acted accordingly.

If I could come to the conclusion that defendant was entitled to half the purchase, I should still doubt whether the sale of it to Mrs. Schwarz, under the circumstances, and for the reasons stated, should not be set aside. I think it should be. There is nothing in the settlement of accounts, when the trust was transferred to Hastings, to prevent it. The settlement was no waiver of her rights, unless she acted at the time with a full knowledge of what her rights were, and with an intention of waiving them. Nothing of the kind appears, but the contrary is clearly to be inferred. She stated at the time, that she thought Mr. Wendell might have waited for his share until the property was sold.

The same observations would apply to the covenant set up in the plea, if it extended to, or reached the case made by the bill.

As to the part Mr. Schwarz took in the business, and the supposed guarantee it afforded against the trustee's taking any advantage of the position in which he stood to the *cestui que trust*, I think it should have no bearing on the case. It was the duty of the trustee to consult and advise with the *cestui que trust*, and not Mr. Schwarz. The very object of a trust for a married woman would, in many cases, be defeated, if the wishes and inclinations of the husband were to be consulted, instead of the interest of the *cestui que trust*. It would be as well, at once, to place the property of the wife at the disposition of her husband.

The complainants filed their bill within three years and a half after the note was given, and within six months after it became due. I do not think the delay unreasonable, or a good ground for refusing relief. The note has not been paid, and the bill was filed soon after it became due, and complainants were called on to pay it.

No charge was made by the trustee for his services, when the trust account was settled. He was, as he stated in his answer, induced not to charge for his services, in consequence of the handsome sum he expected to realise from the sale of the Erie property to the *cestui que trust*. He was entitled to a reasonable compensation for his time and services as trustee. *Ringgold* v. *Ringgold*, 1 *Harr. & Gill*, 11, 83.

A decree must, therefore, be entered, setting aside the settlement of January 28th, 1837; and there must be a reference to a master to take and state an account of all moneys received by defendant, as trustee. In taking the account, the master must charge defendant with the amount of the note of January 28th, 1837, for $3,980.24, with six per cent interest up to the time it became due, and seven per cent interest from that time to the taking

of the account, unless defendant shall cause the note to be cancelled, and surrendered, at or before that time.

And he must allow defendant a reasonable compensation for his time and services as trustee, with interest from the termination of the trust. The question of costs is reserved until the coming in of the Master's report.

NOTE. This case was appealed to the Supreme Court, but was finally settled, without any further proceedings.